Sarah Shapero (Bar No. 281748)
Stephanie Silverman Warden (Bar No. 317711)
SHAPERO LAW FIRM, PC
100 Pine St., Ste. 530
San Francisco, CA 94111
Telephone:   (415) 273-3504
Facsimile:    (415) 358-4116
Email: sarah@shaperolawfirm.com

Attorney for Plaintiff,
GUY HART

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| GUY HART, an individual,<br><br>             Plaintiffs,<br><br>        v.<br><br>SELECT PORTFOLIO SERVICING, INC.;<br>BANK OF AMERICA, N.A.; and DOES 1 TO<br>50.<br><br>             Defendants. | Case No.:  2:22−cv−03399 FLA (JPRx)<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF:**<br><br>1.  Violation of 12 USC § 2605<br><br>2.  Violation of Fair Debt Collection Practices Act<br><br>3.  Unfair Business Practices<br><br>4.  Negligent Misrepresentation<br><br>**DEMAND FOR JURY TRIAL** |

**JURISDICTION AND VENUE**

1.     This is an action asserting violations of California State Law.  These claims arise out of the same controversy or sequence of events. Plaintiff Guy Hart (hereafter, "Plaintiff") is a property owner who brings this action based on Defendants pursuit of foreclosure on Plaintiff's property located at 2930 Neilson Way #306, Santa Monica, CA 90405 (hereafter, the "Property"). Venue is proper in this Court because a substantial part of the events giving rise to the claims herein occurred in the County of Los Angeles.

2.     The court has personal jurisdiction over the parties as all Defendants engage in business within the State of California. Defendants' business involves providing mortgage loans and related services to consumers in the State of California.

**PARTIES**

3.     At all times mentioned herein, Plaintiff was and remains the owner of the Property located at 2930 Neilson Way #306, Santa Monica, CA 90405.

4.     At all times mentioned herein, Plaintiff is informed and believes and therefore alleges that BANK OF AMERICA, N.A. (also referred to herein as, "BANA") is a diversified financial marketing and/or corporation engaged primarily in residential mortgage banking and/or related business and was the servicer of a loan secured by Plaintiff's property during the time periods alleged herein, prior to the purported transfer of the servicing rights to SELECT PORTFOLIO SERVICING, INC. Plaintiff is informed and believes and thereon alleges that BANA regularly conducts business in the State of California.

5.     At all times mentioned herein, Plaintiff is informed and believes and therefore alleges that SELECT PORTFOLIO SERVICING, INC. (hereafter, "SPS" or "Defendant") is a diversified financial marketing and/or corporation engaged primarily in residential mortgage banking and/or related business and was the servicer of the loan secured by Plaintiff's property during the time periods alleged herein, following the purported transfer of servicing rights from BANA in or around 2019. Plaintiff is informed and believes and thereon alleges that SPS regularly conducts business in the State of California.

**AGENCY ALLEGATIONS**

6.    Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each Defendant was acting as the agent, servant, employee, partner, co-conspirator, and/or joint venture of each remaining Defendant.  Each Defendant was acting in concert with each remaining Defendant in all matters alleged, and each Defendant has inherited any and all violations or liability of their predecessors-in-interest.  Additionally, each Defendant has passed any and all liability to their successors-in-interest, and at all times were acting within the course and scope of such agency, employment, partnership, and/or concert of action. Plaintiff is informed and believes and thereon alleges that all Defendants have an agreement to commit the wrongful acts contained herein and that a civil conspiracy exists between all Defendants.

**STATEMENT OF FACTS**

7.    Plaintiff is the current owner of the property located at 2930 Neilson Way #306, Santa Monica, CA 90405 (hereafter, the "Property").

8.    Plaintiff purchased the Property in 1998 and it has served as his primary residence ever since.

9.    In 2004, Plaintiff obtained a first lien loan secured by the property in the amount of $367,700 through BANA. At the time that BANA arranged for the loan, the loan was federally backed.  On or about July 15, 2004, Plaintiff executed an Equity Maximizer Agreement and Disclosure Statement governing a Line of Credit, the "Equity Maximizer Account" with BANA, with a revolving line of credit limit for the principal amount of $135,000.00 (the "Second Loan"). To secure the Second Loan, the Plaintiff executed a Short Form Deed of Trust which secured all obligations of the borrower under the Equity Maximizer Agreement and incorporated the relevant provisions the Deed of Trust recorded on July 19, 1999. BANA was identified as the Lender of the Second Loan.

10.   The Equity Maximizer Agreement and Disclosure Statement included the following provision regarding periodic statements: "Periodic Statements: if you have a balance owing on your equity maximizer account or have any account activity, we will send you a periodic statement. It will show among other things credit advances, finance charges, other charges,

3

payments made, other credits, your previous balance, and your new balance. Your statement will also identify the minimum payment you must make for that billing period and the date it is due."

11.     Plaintiff executed an agreement dated August 26, 2005, entitled "Equity Maximizer - Home Secured Lines of Credit, Credit Limit Increase Agreement" (hereafter, "Credit Limit Increase Agreement") in favor of Lender BANA on or around August 26, 2005. Of note, this Credit Limit Increase Agreement identifies the property securing the account as: "2930 Nielson Way #30, Chatsworth, CA 90405." Separate and apart from the mere typographical error misspelling the street name, the Property in question is not located in the city of Chatsworth but in the city of Santa Monica, and the Unit Number is not #30, it is #306. The property identified in the Credit Increase Agreement is not Plaintiff's Property, 2930 Neilson Way #306, Santa Monica, CA 90405.

12.     The 2005 Credit Limit Increase Agreement provided BANA "has agreed to a credit limit increase on your equity maximizer account. We have a deed of trust or similar lien on your home as security for your account." However, the address again does not even reflect a property located in the same city as Plaintiff's Property. Pursuant to the Credit Limit Increase Agreement, the credit limit was increased to a total of $241,000.00.

13.     Bank of America's egregious conduct played such a significant part in bringing about the 2008 housing and economic crises, that it subsequently entered into an unprecedented $16.5 billion settlement agreement (the "Settlement") with the federal government in 2014, and pursuant to the Settlement, it agreed to provide "Consumer Relief", including: first lien principal forgiveness, principal forgiveness of forbearance, first lien forbearance (payment forgiveness), second lien extinguishments, junior lien forgiveness and extinguishment, credit for purchase money loans, loan modifications, among others.

14.     Following the implementation of the Settlement terms, Plaintiff ultimately obtained modification in or around 2016 that resulted in a modified first loan, inclusive or should have included the modification, extinguishment or combination of both for the Second Lien. Then, after years of Plaintiff diligently making timely payments every month, Plaintiff was floored

when, on or around July of 2019, he was contacted by Defendant SPS, an entity he had never heard of or dealt with previously, about a purported second lien.

15.     As would subsequently be revealed to Plaintiff, the servicing rights in Plaintiff's loan were purportedly transferred by BANA, the prior servicer, to Defendant SPS in or around April of 2019. This was an attempted transfer of servicing rights in a Second Loan that has been extinguished years prior. Plaintiff had not received any monthly or periodic statements regarding the Second Loan since it had been subject to the second lien extinguishment consumer relief provisions of the Bank of America Settlement. As provided in the Equity Maximizer Agreement and Disclosure Statement dated July 15, 2004, secured by the Short Form Deed of Trust, Plaintiff was to receive periodic statements if he had any balance owing or if there was any activity on the account: "Periodic Statements: if you have a balance owing on your equity maximizer account or have any account activity we will send you a periodic statement. It will show among other things credit advances, finance charges, other charges, payments made, other credits, your previous balance, and your new balance. Your statement will also identify the minimum payment you must make for that billing period and the date it is due." Those periodic statements ceased once the loan was extinguished.

16.     The first time Plaintiff was provided with documentation of the alleged assignment of servicing rights was on or around February 18, 2022, when SPS finally, after numerous repeated failures to respond to Plaintiff's numerous Qualifying Written Requests ("QWR") requesting this information as far back as 2019, SPS produced a document entitled "Notice of Assignment, Sale, or Transfer of Servicing Rights" ("Notice of Assignment of Servicing Rights").

17.     Of note, this single page Notice of Assignment of Servicing Rights bears no date, it does not include any information regarding the loan or account to which it purportedly relates, it does not include the borrower's name, and it does not provide the address of the property that purportedly secures said loan. This is an interchangeable, non-specific document that was never sent to Plaintiff and that Plaintiff was unaware even existed until SPS's February 2022 response to the QWR.

18.     As well, the Notice of Assignment of Servicing Rights, by its own terms, correctly states: "The law requires that your present servicer send you a notice at least 15 days before the effective date of transfer or at closing. Your new servicer must also send you a notice no later than 15 days after the effective date or at closing." Despite this, Bank of America, N.A. did not send notice at least 15 days before the transfer which supports Plaintiff's claim that there was no valid loan to be serviced. SPS, likewise, did not provide timely notice, despite the belated production of a letter dated April 26, 2019 that Plaintiff ultimately received in response to a QWR which SPS finally provided in February of 2022.

19.     After years of silence on the alleged Second Loan and Plaintiff having not received any monthly or periodic statements regarding the Second Loan since it was or should have been extinguished in or around 2016, Plaintiff began receiving phone calls from SPS in 2019.

20.     On July 18, 2019, Plaintiff spoke with SPS representative Rosalee Woods. SPS's communication notes documents that Plaintiff explained that the first and second mortgage were combined per Bank of America several years ago and noted, "Customer is requesting QWR- payment history from origination, all origination documents, all letters sent from SPS, noteholder info advsd will put in request –"

21.     As would later be revealed, July 18, 2019 is also a critical date in this case because it was purportedly the date on which, according to SPS employee Shawna Myers who signed the Declaration of Compliance required for filing the Notice of Default under penalty of perjury and stated that: "contact was made with borrower to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure as required by California Civil Code § 2923.55(b)(2)".

22.     In a phone call with SPS on July 24, 2019, Plaintiff inquired as to the nature of SPS's involvement with a purported loan and asked for information regarding who transferred or sold or otherwise conveyed the loan rights to SPS, but the SPS representative hung up on him or otherwise disconnected from the call without calling back. Interestingly, as would subsequently be revealed, SPS's servicing notes on July 24, 2019, entered by SPS Collections

Representative who spoke with Plaintiff reads, in its entirety: "Acct Discussed account was talked about in great detail."

23.     On or around July 24, 2019, Plaintiff sent a "Notice of Dispute, Opposition and Protest of Alleged Debt" to SPS and BANA as well to the entities' respective presidents. The correspondence disputed the debt and provided context by detailing the events leading up to this such as Plaintiff's drawn-out fight to keep his home, including no less than 100 contacts with BANA, SLS, and various foreclosure trustees, having notices of default recorded against the Property only to be eventually rescinded, and finally obtaining a loan modification. Despite this loan modification extinguishing the previous Second Loan, Plaintiff explained the utter confusion he experienced in the preceding few weeks when he first began receiving phone calls from SPS, an entity he had never heard of before nor been contacted by before. Plaintiff also reiterated that since approximately 2012 -2013, he had repeatedly submitted qualified written requests for information including: proof of alleged debt, a full accounting of loan account, all transfers, sales, or assignments of the alleged note.

24.     On July 30, 2019, Plaintiff spoke with SPS representative Denita Pierce. Plaintiff was advised the loan was in default and the demand expired August 4, 2019. Plaintiff inquired about the qualified written request that was sent more than 10 days ago. Plaintiff took issue with SPS attempting to collect a debt that is not owed, and has been disputed, while a Qualified Written Request related to the relevant issues is pending and has yet to be responded to.

25.     On July 30, 2019, Plaintiff spoke with SPS Ombudsmen Andrew Hawkins, who confirmed the qualified written request letter was received July 30, 2019 and will be processed and responded to in writing in 15 to 30 days. Plaintiff reiterated he was requesting information including how the account was originated by whom and when, where the funds were sent. Plaintiff also requested a copy of the assignment of mortgage and was advised that the ombudsman would request it, but it could take 30 to 90 days or longer.

26.     Plaintiff called again on August 1, 2019 and spoke with Ombudsman Janae Smith. Plaintiff explained that he had not even heard of SPS until about three weeks prior to this call. He had never received anything advising that the servicing of his account had been

transferred to SPS. He further reiterated that there should be no debt owed. Also on this call, Plaintiff was told the QWR was completed today and that he would be receiving the information shortly. When the issue of a repayment plan offer was brought up, Plaintiff explained that he had never received such an offer and was told that the letter would be included in the QWR response. The ombudsman advised Plaintiff that the repayment plan would expire and there was no guarantee the repayment plan would be reopened if he did not accept it before expiration. Plaintiff explained that he would not make a payment on the repayment plan until he was able to verify that the debt is still in fact owed.

27.     Plaintiff's attempts to get information from SPS throughout in August of 2019 were similarly unhelpful. On August 8th Plaintiff spoke with an SPS representative in the Primary Collections Department and he was advised that the ombudsman is handling the account. On August 19th, Plaintiff spoke with a different SPS representative in the Primary Collections Department and was advised that the Ombudsman will answer back in writing.

28.     On August 27, 2019, Plaintiff called and spoke with Maria Tellez in Loss Mitigation Plaintiff was told the demand letter expired and the account was possibly going to be referred to an attorney for legal action. Plaintiff explained again why he was not responsible for the debt defendant was attempting to collect. Plaintiff was advised he would receive a response in writing. Plaintiff was further advised that "based on our records account was not paid off" and "plaintiff also requested a record of all prior investors in the loan and was advised to submit the request in writing" which he already had done. Plaintiff reiterated his request that SPS properly respond and provide validation of debt and the requested documentation, but to no avail.

29.     On September 27, 2019, Plaintiff spoke with Miriam Dicupe from Primary Collections at SPS. Plaintiff was advised that the dispute resolution letter was sent on September 25, 2019. He was further advised that the demand letter had expired. Plaintiff once again explained the purported transfer of the Loan servicing to Defendant was invalid because there was no debt owed on second Loan due to the resolution with Bank of America. SPS further documented that "[Plaintiff] was informed that the prior servicer has not provided the requested documentation he

requested, and he will need to contact the prior servicer for the documentations [sic] they have not provided us."

30.     On September 27, 2019, Plaintiff once again sent a "Notice of Dispute, Opposition and Protest of Alleged Debt" to SPS and BANA.

31.     A Debt Validation Notice dated October 12, 2019, from Clear Recon Corp stating that the company represents the creditor to whom the debt on the above referenced home loan is owed. You are hereby notified that: as of 10/12/2019 the amount owed on the debt is $65,109.65; unless you dispute of the dead within 30 days after receipt of the notice, the debt will be assumed to be valid by us and the creditor. The notice further provided: "If within 30 days after receipt of the notice: (i) you notify this office in writing that you dispute the debt then we will obtain and mail to you verification of this debt or a copy of any judgment against you; (ii) you request in writing that we obtained the name and address of the original creditor, if different from the current creditor, then we will obtain and mail it to you; (iii) You notify us in writing that you dispute this debt, then we will cease collection of the debt until we obtain verification and mail it to you; (iv) you request in writing the name and address of the original creditor if different from the current creditor, then we will cease collection of the debt, until we obtain the name and address of the original creditor and mail it to you."

32.     Plaintiff submitted another QWR on October 19, 2019, noting that this was not his third request for the information and documents including the periods of 2005 through 2014 (Pre-Bank of America Settlement) and the 2015 to 2019 (Post-Bank of America Settlement), and the alleged transfer or sale to SPS who, now years after the debt resolution, is attempting to collect the nonexistent debt. The QWR also sought documentation of all transfers, sales, settlements and correspondence regarding the account.

33.     Throughout Plaintiff's correspondence with SPS he repeatedly explained that, following the Bank of America Settlement, he had not even received a monthly mortgage statement or any indication that there was an existing debt owed for years, and only now that SPS was purportedly servicing this account has this issue arisen.

34.     On October 24, 2019, Plaintiff spoke with Sohail Iqbal, an Ombudsman at SPS ("Ombudsman Iqbal") who informed him that they would be communicating with Bank of America regarding the issue, and they did not have a time estimation but "assusred [sic] him I will be communicating with him until it has concluded."

35.     On October 26, 2019, Plaintiff once again sent a "Notice of Dispute, Opposition and Protest of Alleged Debt" to SPS and BANA, which additionally addressed Clear Recon Corp correspondence and took issue with overall lack of transparency in Defendants' and their agents' conduct explaining that this letter, among other issues: did not identify the property address, did not mention SPS, did not mention foreclosure notice, did not mention it was being sent from a law firm, and did not identify Plaintiff's name on the document. Fortunately, Plaintiff was diligent enough to investigate and find out that this letter was related to SPS, the company that contacted him a few months prior about an alleged debt that he is disputing.

36.     Plaintiff's October 26, 2019, correspondence went on to state that he awaited a written response confirming receipt. Also requested reversal of the foreclosure status and a proper response to all qualified written requests submitted multiple times, particularly regarding the periods of 2005 through 2014 (Pre-Bank of America Settlement) and the 2015 to 2019 (Post-Bank of America Settlement), and the alleged transfer or sale to SPS who, now years after the debt resolution, is attempting to collect the nonexistent debt.

37.     On October 29, 2019, Ombudsman Iqbal informed Plaintiff SPS had no record that the accounts were settled but "advised him that the concerns he provided in writing will be addressed."

38.     On November 7, 2019 Ombudsman Iqbal informed him that it was still in review and once they have a response the om *Rotkiske v. Klemm*, 140 S. Ct. 355, 358 (2019).budsman would contact him. Plaintiff reiterated that he was requesting 2005 through 2014 pre-settlement records and 2015 through 2019 post settlement including all records regarding the validity of the debt and that SPS's prior response was insufficient.

39.     On November 19, 2019 Ombudsman Iqbal documented that during the call, he informed Plaintiff that the loan "due date" was August 25, 2012.  Ombudsman Iqbal also

confirmed that the dispute regarding the validity of the debt was submitted, and that Plaintiff would have to "allow time for review". During this call Plaintiff reiterated his request for the records as outlined in his correspondence.

40.     On December 6, 2019, Plaintiff called for an update on the status of his disputes of the debt, spoke with SPS Ombudsman Gabriela Carpio who informed him that but the disputes are still under review and no outcome has been determined yet. SPS's documentation firther confirms that the ombudsman "Advised him of 11-20-19 letter confirming receipt of the dispute and advising timeframe for response, 30 days from receipt of inquiry." In a follow up call on December 9, 2019, Plaintiff spoke with Iqbal but was told the same thing as on, that dispute is "still in process".

41.     On December 16, 2019, according to the notes entered by loss mitigation specialist Letai Naeata: "there was a previous dispute that was recently closed on this account. Customer believes that this loan should have been resolved and lien released years ago ... [d/t BofA settlements). He has requested several documents previously and was informed by advocacy that some of the document requests were too broad and could not be completed. He resubmitted more specific document requests. The documents being requested include: SPS debt validation letter, all loan origination documents, all servicing transfer letters since loan origination, all sale of notes letters, all written or electronic communications from 2012 to 2015."

42.     According to the Declaration of Compliance required for recording a Notice of Default against Plaintiff's home, signed by SPS employee Shawna Myers under penalty of perjury on December 24, 2019: "on 07/18/2019 contact was made with borrower to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure as required by California Civil Code § 2923.55(b)(2)".

43.     On December 30, 2019, Plaintiff called SPS for an update on the status of his disputes of the debt, spoke with SPS Loss Mitigation David Cordova who informed him that, but the disputes were received and was advised to "allow time for appropriate department for review."

44.     Between January 8, 2020, and February 7, 2020, Plaintiff contacted SPS on no less than four occasions regarding the status of his Notice of Dispute. On each of the four calls, he spoke with a different person, each of whom informed him that the Notice of Dispute had been received and was being reviewed. Not one of these individuals could provide a timeframe within which he could expect a response.

45.     On February 13, 2020, Plaintiff spoke with Ombudsman Gabriela Carpio, again requesting an update of the status of the dispute. For the very first time, Plaintiff was told that SPS had received the email but "could not access the attachments."

46.     On February 18, 2020, Plaintiff spoke with DeAndre Robinson in Primary Collections, he reiterated the situation again. Explained the numerous QWRs, Settlement, etc. Robinson documented: "I assured him the account would be noted and confirmed a dispute has been open[ed] on the account 2/18/20." Plaintiff requested to speak to the Ombudsman, but the representative was unable to transfer the call successfully and instead made a request for the relationship manager to call Plaintiff back.

47.     Throughout February of 2020 and into early March of 2020, the pattern repeated and Plaintiff's numerous attempts to get a response to his notice of dispute were unavailing.

48.     On March 4, 2020, Plaintiff spoke with Jamie Gonzalez from Loss Mitigation. Plaintiff had again contacted SPS inquiring as to the status of his notice of dispute of debt. Plaintiff was once again advised that SPS had received the inquiry and it can take up to 30 days. Plaintiff, understandably frustrated at this point, reiterated his position that the notice of default should be promptly rescinded, but it was clear he was at the mercy of SPS and had few options. Once again, he was left waiting for SPS to respond.

49.     Shortly thereafter, the Covid-19 pandemic took hold and coupled with the economic hardships of lockdowns at the city, state, and national level, Plaintiff was among the many homeowners who were affected. Plaintiff contacted SPS to inquire as to loss mitigation options available to borrowers like himself who were experiencing Covid-19 related hardships.

50.     Plaintiff then was forced to jump through hoops to be considered for mortgage assistance options, filling out the requested forms and submitting the documents, only to be told he had to

do it all over again because he had forgotten to include the loan number on one of the pages, or because he had checked an extra box on a form, or some other arbitrary issue that should not have stalled the process in light of the Covid-19 guidance for handling mortgage assistance requests.

51.     Despite Plaintiff requesting mortgage assistance and had submitted an assistance application, Plaintiff was not provided a single point of contact. In fact, on numerous occasions between March of 2020 through at least January of 2021, Plaintiff would reach out to SPS regarding his request for assistance only to be put into contact with various individuals at SPS who worked in Primary Collections, as opposed to Loss Mitigation.

52.     On July 7, 2020, Plaintiff spoke with Ivory Green at SPS Collections and explained that he was seeking a forbearance due to Covid-19 related hardship. Plaintiff did not receive any substantive information from Ms. Green, nor did he receive a follow-up call from anyone else at SPS. Plaintiff's inquiry regarding the mortgage assistance options available to him was not handled by a single point of contact, or at a minimum, an SPS representative from the Loss Mitigation Department who knew or could access the necessary information; instead, it was a representative from the Primary Collections Department. Had SPS complied with its obligations as a mortgage loan servicer, Plaintiff's Second Loan would not have forced him to the brink of foreclosure, based on a disputed debt, during the middle of a global pandemic.

53.     In correspondence from SPS to Plaintiff dated August 20, 2020, SPS noted that they would "like to assist with resolving the delinquency on this account." The letter further states that SPS made attempts through letters and or by phone to discuss the situation and "though we have been unsuccessful in reaching a resolution, we would like to provide you the following trial modification plan that will result at a lower payment and bring the account current." There was no doubt at this point that SPS had no intention of responding in good faith to Plaintiff's many attempts to address the crucial issue that there was no longer a debt owed. The correspondence identified Plaintiff's assigned relationship manager as Eunice Lamptey, though she was the "assigned relationship manager" in name only because, at the subsequent days, weeks and months passed, Ms. Lamptey ultimately spoke with Plaintiff on approximately two occasions as he would

continue to be passed around to different SPS employees who had no knowledge of his account situation and no ability or willingness to meaningfully assist him.

54.     Under the trial modification plan plaintiff would make his first trial payment on October 1, 2020, but as addressed infra, Plaintiff was not even made aware of the offer until late September.

55.     On September 22, 2020, Plaintiff spoke with an SPS representative identified in SPS's documentation as David McCray1 in SPS Primary Collections Department. Much to Plaintiff's surprise the SPS representative stated that he had been pre-approved for a trial modification with the first payment of $1399.12 due on October 1, 2020. Plaintiff responded that he was unaware of any offer and had not received any such information but was not prepared to accept at the moment. Plaintiff was then told that he could be more fully reviewed for assistance options if he provided a complete request for mortgage assistance.

56.     In December of 2020, with the threat of foreclosure looming despite the disputed debt, Plaintiff was left with very few options and ultimately submitted the request for mortgage assistance ("RMA") along with the requested documentation. In this RMA, as well as in all subsequent RMAs that Plaintiff would be forced to submit to comply with SPS's repeated demands, Plaintiff specifically noted that the alleged debt was actively being disputed while awaiting Defendant's response to Qualified Written Requests.

57.     The QWRs submitted by Plaintiff included Notices of Error, addressing SPS's incorrect characterization of the status of the purported debt.

58.     Plaintiff spoke with Titus Preston of SPS's Primary Collections Department on December 17, 2020.  Mr. Preston confirmed that the RMA had been received but was deemed incomplete, noting: "need verbal or written senior lien payoff quote with UPB amount" and that section two of the RMA Plaintiff submitted had "multiple intent checked which is not acceptable hence need updated RMA with correct intent checkbox to be checked."

59.     On December 24, 2020, Plaintiff spoke with Sharon Sedgwick in Loss Mitigation at SPS. plaintiff apprised miss Sedgwick of the disputed status of the debt. While speaking with miss Sedgwick plaintiff was attempting to complete the SPS online Covid-19 survey but was

experiencing technical difficulties and was being "timed out". Plaintiff provided the best phone number for her to call him back at, and SPS's own documentation notes that there was an "SPOC Call Back Req" on December 24, 2020, at 10:20 AM, but the next contact was not made until three weeks later.

60.     On January 15, 2021, Plaintiff spoke with yet another unfamiliar SPS employee, Jabril Mathis, in Primary Collections, who documented that he they "discussed missing documents" and he "informed [Plaintiff] we need him to resubmit RMA". On January 22, 2021, Plaintiff spoke with a different SPS representative from Primary Collections, Genevieve Rodgers, and he provided additional information regarding the Unpaid Principal Balance on the First Loan. Plaintiff also confirmed during the call that he had resubmitted a new RMA.

61.     On January 23, 2021, Plaintiff sent a detailed explanation of his Covid-19 related hardship, recounting the devastating effect the shutdowns continued to have on his income. This was not new information to SPS, Plaintiff notes that he had provided the information numerous times both in writing and verbally.

62.     During a phone call with SPS Ombudsman Ashten Hilkey on February 11, 2021, Plaintiff called to discuss his serious concerns regarding the foreclosure action. Plaintiff explained that he is continuing to work to obtain assistance and that he provided the unemployment statement being requested, but apparently SPS had not received it. The Ombudsman then stated that SPS had in fact received the unemployment letter for review and that she was "sending this for review to update covid plan." To the credit of Ombudsman Hilkey, her involvement was a marked contrast to the countless SPS representatives and Plaintiff even noted his appreciation for a point of contact who would usually answer his calls or call him back.  However, due SPS's systemic failures the inconsistent and uncoordinated approach to mortgage assistance request persisted with respect to Plaintiff's RMA including the failure to provide a SPOC in compliance with SPS's obligations as a mortgage loan servicer, the arduous process persisted.

63.     Throughout February of 2021, Plaintiff was repeatedly asked to submit documentation he had already submitted including repeated requests for unemployment forms after the documents had been provided.

64.     In correspondence dated March 10, 2021, from SPS to Plaintiff, SPS informing him that he had qualified for and was being offered an Unemployment Plan. The correspondence also notes that the decision was limited to the evaluation of certain options available to plaintiff as a result of the pandemic, not based on a complete assistance review application. The correspondence identified Plaintiff's assigned relationship manager as Eunice Lamptey, though she was the "assigned relationship manager" in name only because, at the subsequent days, weeks and months passed, Ms. Lamptey ultimately spoke with Plaintiff on approximately two occasions as he would continue to be passed around to different SPS employees who had no knowledge of his account situation and no ability or willingness to meaningfully assist him.

65.     Under the terms of the unemployment program, plaintiff was provided a temporary forbearance plan allowing him to make reduced payments during the term of the plan. The monthly payments under the temporary forbearance plan were $180.92. The correspondence noted "we will not proceed to foreclosure sale or commence foreclosure proceedings during the planned term provided you are complying with the terms of this plan you acknowledge that we may commence foreclosure proceedings if you do not comply with the terms and conditions of the plan." Again, with few options available, Plaintiff was forced to accept or risk losing his home; as such he made the payments under the plan.

66.     For each of the $180.92 payments that Plaintiff made under the forbearance plan, Plaintiff wrote that the payment was being made in good faith while the QWRs and alleged debt validation review was pending. Plaintiff sent correspondence to email correspondence to SPS Ombudsman Hilkey and the SPS Loss Mitigation Department specifically noted that am paying the requested settlement

67.     On November 1, 2021, an SPS representative from Collections documented that Plaintiff had contacted SPS to request that they provide him an RMA, because he had yet to receive one. Although the SPS representative notes that one will be sent, she also noted that there was "no need to provide the mailing address listed on the account"; as a result of that omission, it is unclear where the application was sent because plaintiff hadn't received it. It's also unclear why the application could not have been emailed to him, despite he had communicated via email on

numerous occasions with SPS. Ultimately the delay served to create an opportunity for SPS to cause a notice of default to be recorded against Plaintiff's home.

68.     On November 19, 2021, SPS caused a Notice of Default to be recorded by Clear Recon Corp against Plaintiff's home, erroneously stating the amount in default to be $182,168.

69.     Plaintiff contacted SPS on no less than five occasions in December of 2021 alone. Plaintiff was desperately attempting to resolve the issue of the disputed debt as well as to have the NOD, which never should have been recorded in the first place, promptly rescinded.

70.     Plaintiff contacted SPS on February 8, 2022, informing SPS that he had not received a dispute resolution letter on his account. He reiterated that he requested his entire account history from 2014 forward due to these crucial unresolved issues of the purported debt. SPS's documentation does not indicate that any response to these issues were provided at the time of the call or thereafter.

71.     In a letter dated February 18, 2022, SPS acknowledged receipt of plaintiff's correspondence received on February 9, 2022.  Plaintiff had requested information regarding the identity of the noteholder and in response, SPS identified US Bank Trust National Association, as trustee, for MEB Loan Trust as the owner of the account, and SPS is the mortgage servicer of the account and provided contact information for the owner of the account, identified as

ABS Loan trust VI, LLC, as administrator, and Marathon asset management, yet no supporting documentation was produced of assignments or transfers beyond the highly unusual Notice of Assignment, Sale, or Transfer of Servicing Rights, discussed infra.

72.     In a letter dated February 18, 2022, SPS's untimely response to the QWRs, SPS addressed his request for documentation to support or validate the debt by explaining: "SPS is a mortgage servicer, and the servicing of your account was transferred to SPS from Bank of America and a on May 1, 2019. Enclosed is a copy of the notice of servicing transfer evidencing this transfer. As a servicer, SPS services the account according to the terms of the enclosed Bank of America equity maximizer agreement and disclosure statement and short form deed of trust that were signed at

origination." This conclusory statement did not speak in any way to the status of the purported debt, given Plaintiff expressly stated that the debt was extinguished between 2014 and 2015, this the existence underlying note does not speak to the present status of the purported loan or debt.

73.     As was revealed to Plaintiff, the servicing rights in Plaintiff's loan were purportedly transferred by Bank of America, N.A., the prior servicer, to Defendant SPS in or around April of 2019. The attempted transfer of servicing rights in a Second Loan that has been extinguished for years. Plaintiff was never informed of any such assignment until on or around February 18, 2022, when SPS finally, after numerous repeated failures to respond to Plaintiff's numerous Qualifying Written Requests ("QWR") requesting this information as far back as 2019, SPS produced a document entitled "Notice of Assignment, Sale, or Transfer of Servicing Rights" ("Notice of Assignment of Servicing Rights").

74.     Of note, this single page Notice of Assignment of Servicing Rights bears no date, it does not include any information regarding the loan or account to which it purportedly relates, it does not include the borrower's name, and it does not provide the address of the property that purportedly secures said loan. This is an interchangeable, non-specific document that was never sent to Plaintiff and that Plaintiff was unaware even existed until SPS's February 2022 response to the QWR.

75.     The correspondence dated February 16, 2022, went on to state "As the mortgage servicer, SPS is authorized to collect all payments and administer the terms of the note and security instrument. Questions or disputes regarding the account and any requests for mortgage assistance should be directed to SPS in order to ensure a timely response and resolution." Clearly, the questions and dispute regarding the account that Plaintiff had addressed countless time with no meaningful response did not receive a timely response and resolution.

76.     Then on February 25, 2022, Clear Recon Corp recorded a notice of trustee sale against Plaintiff's home at the direction of SPS. The amount stated was $305,023. Again, Defendants were attempting to collect over $300,000 on a debt that did not exist, and that Defendants had failed to validate.

18

77.     Between March 8, 2022, and April 13, 2022, Plaintiff repeatedly sent Urgent Notices to SPS regarding the Second Loan to stop the trustee's sale but to no avail.

78.      On March 10, 2022, Plaintiff submitted a complete RMA.

79.     In a March 16, 2022, conversation with SPS supervisor Plaintiff requested, yet again, the following information and records as stated in previous QWRs: "occurrences, transfers of ownership, sales of note, securitization of note, communication emails and notes, accounting, original note with original signature, communications related to settlement offset and resolving any outstanding debt, copy of all documents both physical and digital that involve my property my name and my Social Security".

80.     On April 13, 2022, Plaintiff spoke Leah at SPS ombudsman department to inquire about request for mortgage assistance and qualified written request. Then, Plaintiff was told for the first time that the request for mortgage assistance was not considered because the application marked both keep the property and negotiate the payoff and there was a missing account number on the second page.

81.     On April 14, 2022, plaintiff once again sent a notice to stop the trustee's sale and yet another qualified written request reiterating the information, he had sought countless before.

82.     On April 15, 2022, Plaintiff spoke with SPS supervisor named Ginger and specifically requested a call back from a Compliance Officer or higher-ranking executive who could had the authority to address the urgent issue in regards to SPS's refusal to cancel/postpone the trustee's sale while the issues are addressed and while he still awaits an appropriate response to his numerous QWRs and requests for validation of the debt.

83.     To date, Defendants have failed to respond adequately, if at all, to any of requests. Further, despite the RMA submitted (and resubmitted again most recently on April 14, 2022), Plaintiff has received no response and no decision has been made regarding his assistance request. Despite this, a Trustee's Sale of the Property remains scheduled for May 10, 2022, while the application is still pending and during which time, even if the application is denied the Trustee's Sale is still scheduled to occur during the statutorily proscribed 30-day appeal period.

84.     This lawsuit follows.

**FIRST CAUSE OF ACTION**
**Violation of 12 USC § 2605, et seq.**
**(AGAINST DEFENDANT SPS)**

85.     Plaintiff incorporates all allegations of this complaint and re-allege them as though they were fully set forth herein.

86.     The Real Estate Settlement Procedures Act, 12 U.S.C. 2601 et seq. ("RESPA") is a consumer protection statute that imposes a duty on servicers of mortgage loans to acknowledge and respond to inquiries from borrowers. See 12 U.S.C. § 2605(e); Freeman v. Quicken Loans, 132 S. Ct. 2034, 2038 (2012). When a borrower submits a QWR—written correspondence that includes the borrower's name and account and sufficient detail about the information sought—the servicer must provide "a written response acknowledging receipt of the correspondence" and take certain other responsive actions within specified time periods. 12 U.S.C. § 2605(e)(1)(A), (e)(1)(B), (e)(2).

87.     Defendant's conduct constitutes violations of 12 USC § 2605(e) which provides that a servicer must respond to any qualified written request by a borrower for information relating to the servicing of the loan within a certain time frame and with certain information.

88.     Unlike the earlier regulation that applied to qualified written requests, the scope of an information request under § 1024.36 is not limited to information that is "related to the servicing" of the loan. See Section-by-Section Analysis, § 1024.36(f)(1)(iv), 78 Fed. Reg. 10,761 (Feb. 14, 2013) ("the final rule . . . does not limit information requests to those related to servicing").

89.     Rather, requests are valid if they seek any information concerning the borrower's mortgage loan. Thus, the question as to whether the borrower has sent a valid information request no longer turns on the narrow definition of "servicing" found in RESPA that focuses on the receipt of payments from the borrower. Requests are valid even if the mortgage loan is in default and the servicer is not "receiving" payments from the borrower.

90.     What constitutes the "servicing file" that the borrower may obtain through a request for information is addressed in the general servicing requirements of Regulation X, at section

1024.38.  Reg. X, 12 C.F.R. § 1024.38(c)(2) requires the servicer to maintain the following documents and data on each mortgage loan account it services in a manner that facilitates compiling such documents and data into a servicing file within five days:

- a schedule of all transactions credited or debited to the mortgage loan account, including any escrow account and any suspense account;
- a copy of the security instrument that establishes the lien securing the mortgage loan;
- any notes created by servicer personnel reflecting communications with the borrower about the mortgage loan account;
- a report of the data fields relating to the borrower's mortgage loan account, to the extent applicable, created by the servicer's electronic servicing systems; and
- copies of any information or documents provided by the borrower to the servicer in accordance with the notices of error procedures under section 1024.35 or the loss mitigation procedures under section 1024.41.

91.    Defendant entirely failed to do so.  On dozens of occasions between July of 2019 through the April of 2022, Plaintiff sent Qualified Written Requests to Defendant SPS seeking information and documents to which Plaintiff was entitled and which SPS was obligated to respond in a timely and accurate manner. Namely Plaintiff asked for proof of alleged debt, a full accounting of the loan amount, and all transfers, sales, or assignments of the alleged note.  However, SPS refused to respond within the time frame allotted and in fact, refused to produce requested documents until as recently as February of 2022.

92.    Plaintiff sent SPS Qualified Written Requests ("QWR") pursuant to RESPA, 12 U.S.C. § 2605(e)(1)(B), requesting, among other things, that SPS provide him with specific information and documents relating to the purported mortgage account, the loan, and the servicing thereof.

93.    Plaintiff is still awaiting a response to the QWRs submitted on in March and April of 2022.

94.    In a letter dated February 18, 2022, SPS's untimely response to the QWRs, SPS addressed his request for documentation to support or validate the debt by explaining: "SPS is a mortgage servicer, and the servicing of your account was transferred to SPS from Bank of America and a on May 1, 2019. Enclosed is a copy of the notice of servicing transfer evidencing this transfer. As a servicer, SPS services the account according to the terms of the enclosed Bank of America equity maximizer agreement and disclosure statement and short form deed of trust that were signed at origination." This conclusory statement did not speak in any way to the status of the purported debt,

21

given Plaintiff expressly stated that the debt was extinguished between 2014 and 2015, this the existence underlying note does not speak to the present status of the purported loan or debt.

95.    As a result of Defendant's violations of this statute, Plaintiffs have suffered actual damages including, but not limited to, loss of money and property, losses through overcharges, incurred attorneys' fees and costs to save his home, a loss of reputation and goodwill, destruction of credit, severe emotional distress, frustration, fear, anger, helplessness, nervousness, anxiety, sleeplessness, sadness, and depression, according to proof at trial but within the jurisdiction of this Court.  Defendant consciously disregarded Plaintiffs' rights, deliberately breaching their respective duties, showing willful misconduct, malice, fraud, wantonness, oppression, and entire want of care, thus authorizing the imposition of punitive damages.

**SECOND CAUSE OF ACTION**
**Violation of the Fair Debt Collection Practices Act**
**(Against ALL Defendants)**

96.    Plaintiff incorporates all allegations of this complaint and re-allege them as though they were fully set forth herein.

97.    The Fair Debt Collection Practices Act ("FDCPA") provides that a debt collector may not use unfair or unconscionable means to collect or attempt to collect any, including use of a false representation of the character, amount, or legal status of any debt. See 15 U.S.C. § 1692e(2)

98.    Pursuant to 15 U.S.C. § 1692a(6), Defendants are debt collectors because they regularly collect or attempt to collect debts owed or due or asserted to be owed or due to another.  Plaintiff is informed and believes that Defendants are debt collectors pursuant to the Fair Debt Collection Practices Act.

99.    The FDCPA prohibits the following collection practices: making a false representation about the character, amount, or legal status of a debt (15 U.S.C. § 1692e(A)(2)), threatening to take action that cannot be legally taken (15 U.S.C. § 1692e(A)(5)), using a false representation to attempt to collect the debt (15 U.S.C. § 1692e(A)(10); and attempting to collect an amount not expressly authorized by the loan agreement (15 U.S.C. § 1692f(1)).

100.    In the case at bar, both Defendants SPS and BANA violated each of these provisions by collecting on a debt that was not owed and could not be legally demanded.

101.    Plaintiff's Second Loan was eligible for the Hamp Second Lien Modification Program (HAMP 2MP).

102.    BANA was on the list of participating servicers for HAMP 2MP.  Under the HAMP Second Lien Modification Program (2MP) which BANA was a participant in, after Plaintiff accepted the modification offer on the First Lien, BANA was required to either (1) offer to modify the Second Lien or (2) extinguish the Second Lien.

103.    SCS as assignee of the Second Loan as the servicer and beneficiary of Plaintiff's loan, Defendants had a duty to investigate the loan file and to use reasonable care in handling Plaintiff's loan. In the present case, Defendants fell well below the standard of care in fulfilling this duty as they knew that Plaintiff was required to receive either an extinguishment of the loan or a HAMP modification as required by the HAMP directive.

104.    Because Plaintiff received no further correspondence or monthly statements from BANA or SCS after 2016, Plaintiff reasonably believed that BANA or SCS had extinguished the Second Lien as required under HAMP.

105.    As a result of Defendants' unfair or unconscionable means to collect debt, Plaintiff has suffered damages including, but not limited to, credit damage, overcharges of principal and interest which were not owed, and severe emotional distress, including but not limited to, loss of appetite, frustration, fear, anger, helplessness, nervousness, anxiety, sleeplessness, sadness, and depression, according to proof at trial but within the jurisdiction of this Court.

106.    Pursuant to 15 U.S.C. § 1692k, Defendants are liable for actual damages, civil penalties in the amount of $1,000, attorney's fees, and costs of court. (Civ. Code § 1788.30; 15 U.S.C. § 1692k(a)).

107.    An action under the FDCPA may be brought "within one year from the date on which the violation occurs." §1692k(d). This case requires us to determine when the FDCPA's limitations period begins to run. We hold that, absent the application of an equitable doctrine, the statute of limitations in §1692k(d) begins to run on the date on which the

alleged FDCPA violation occurs, not the date on which the violation is discovered. *Rotkiske v. Klemm*, 140 S. Ct. 355, 358 (2019).

108.     "[L]ong-settled equitable-tolling principles" instruct that "'[g]enerally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way.'" *Credit Suisse*, 132 S. Ct. at 1419 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005)).  *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1052 (9th Cir. 2013)

109.     As to the first element, "[t]he standard for reasonable diligence does not require an overzealous or extreme pursuit of any and every avenue of relief. It requires the effort that a reasonable person might be expected to deliver under his or her particular circumstances." *Doe v. Busby*, 661 F.3d 1001, 1015 (9th Cir. 2011). Central to the analysis is whether the plaintiff was "without any fault" in pursuing his claim. *Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240 (9th Cir. 1996).  *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1052 (9th Cir. 2013).

110.     Regarding the second showing, "a garden variety claim of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing deadline, does not warrant equitable tolling." *Holland*, 130 S. Ct. at 2564. Instead, a litigant must show that "extraordinary circumstances were the cause of his untimeliness and . . . ma[de] it impossible to file [the document] on time." *Ramirez*, 571 F.3d at 997.  Accordingly, "[e]quitable tolling is typically granted when litigants are unable to file timely [documents] as a result of external circumstances beyond their direct control." *Harris v. Carter*, 515 F.3d 1051, 1055 (9th Cir. 2008).  *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1052 (9th Cir. 2013).

111.     Plaintiff's circumstances justify equitable tolling.  As noted, Plaintiff took a reasonable effort to dispute Defendant's SPS's allegations of the amount owed and the validity of the Second Loan by exercising his rights to request information and documents through a QWR under RESPA.  Plaintiff was also reasonable in his belief that SPS would deliver the requested information and documents within the statutory deadline.  When SPS failed to deliver timely, Plaintiff reasonably took steps to push SPS for the requested documents, multiple times a month for the next year and seven months.  If anything, Plaintiff took special care and beyond the

threshold of reasonableness by persistently asking SPS for his requested documents which he was legally entitled to for over a year and a half.  Plaintiff could not have possibly known if he had a valid FCPD claim because Defendant stalled for a year and seven months to produce a legally insufficient purported "Assignment of Servicing Rights" which was more of an interchangeable, non-specific document that failed to contain relevant dates, loan or account numbers, name of borrower or address of the subject property. Plaintiff was entitled to a timely delivery of his RESPA mandated documents, which was made with a great deal of time to spare.  In short Plaintiff's claim should equitably tolled because his untimely claim was due to external forced beyond his control.

### THIRD CAUSE OF ACTION
**Negligent Misrepresentation**
**(AGAINST ALL DEFENDANTS)**

112.    Plaintiff incorporates all allegations of this complaint and re-alleges them as though they were fully set forth herein.

113.     The elements for negligent misrepresentation are: (1) a misrepresentation; (2) made negligently; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage.

114.    As set forth in detail above, Defendant SPS repeatedly, orally and in writing, represented to Plaintiff that his numerous inquiries seeking documentation to validate the purported debt and well and information regarding the status of the purported loan would be meaningfully responded to and any issues that were identified would be addressed. Defendant SPS continued to make the misrepresentations to Plaintiff while using the delay it created to record a notice of default against the Property.

115.    Furthermore, it was reasonable for Plaintiff to rely on Defendant's representation regarding the status of the loan because it was in the best position to inform Plaintiff about the status of the loan, as the servicer of the loan. Defendant's exact motive for making misrepresentations to Plaintiff is clear by virtue of the fact that they knew, or should have known, their representations to be false, and that it allowed SPS to move forward with

initiating foreclosure proceedings while keeping Plaintiff at bay, awaiting a substantive response.

116.    Defendant SPS also misrepresented that Plaintiff was in default on his account due to a debt that had purportedly been validated, and that foreclosure action could be taken against Plaintiff's home if he did not make the payments demanded by SPS. In reliance on the representation that SPS had the authority to cause foreclosure action to be initiated against his home, Plaintiff made the requested payments in order to prevent the loss of his home.

117.    As set forth above, Defendant BANA represented to SCS that Plaintiff's Second Loan was not eligible for relief under HAMP 2MP.  BANA knew or should have known that Plaintiff's Second Loan as they owed a duty to investigate the loan file and to use reasonable care in handling Plaintiff's loan. In the present case, Defendants fell well below the standard of care in fulfilling this duty as they knew that Plaintiff was required to receive either an extinguishment of the loan or a HAMP modification as required by the HAMP directive.

118.    Because Plaintiff received no further correspondence or monthly statements from BANA or SCS after 2016, Plaintiff reasonably believed that BANA or SCS had extinguished the Second Lien as required under HAMP.

119.    As a result of Plaintiff's reasonable reliance, he has suffered, and continues to suffer, actual damages including, but not limited to, loss money and equity, damage to credit, incurred attorneys' fees, late fees and costs, a loss of reputation and goodwill, emotional distress, loss of appetite, frustration, fear, anger, helplessness, nervousness, anxiety, sleeplessness, sadness, and depression, according to proof at trial but within the jurisdiction of this Court.

**FOURTH CAUSE OF ACTION**
**Unfair Business Practices**
**Violation of Business and Professions Code Section 17200** *et seq.*
**(AGAINST ALL DEFENDANTS)**

120.    Plaintiff incorporates all allegations of this complaint and re-alleges them as though they were fully set forth herein.

121.    Defendant's conduct, as alleged above, constitutes unlawful, unfair, and/or fraudulent business practices, as defined in the California Business and Professions Code § 17200 et seq. California Business and Professions Code § 17200 et seq. incorporates and provides a basis for enforcement of violations of other statutes and laws and those violations as a business practice.

122.    Specifically, Defendant's violations 12 USC § 2605 *et seq.*, and 15 USC § 1692 *et seq.* constitute unfair business practices in violation of California Business and Professions Code § 17200 *et seq.*

123.    Defendant's negligent misrepresentations constitute unfair business practices in violation of California Business and Professions Code § 17200 *et seq.*

124.    As a result of Defendant's wrongful conduct, Plaintiff has suffered various injuries according to proof at trial, including but not limited to the imminent loss of property.

125.    Plaintiff seeks injunctive relief enjoining Defendant from engaging in the unfair business practices described herein.

126.    Plaintiff further seeks restitution, disgorgement of sums wrongfully obtained, costs of suit, reasonable attorney's fees, and such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL AND PRAYER FOR DAMAGES</u>

WHEREFORE, Plaintiff GUY HART demands a trial by jury.  Plaintiff prays for judgment and order against Defendants, as follows:

1. That judgment is entered in Plaintiff's favor and against Defendants, and each of them;

2. For damages, disgorgement, and injunctive relief;

3. For punitive damages;

4. For injunctive relief;

5. For attorney's fees;

6. For such other and further relief as the Court may deem just and proper.

DATED: June 16, 2022                    Respectfully submitted,

                                         SHAPERO LAW FIRM

                                         */s/ Sarah Shapero*
                                         Sarah Shapero, Esq.
                                         Stephanie Warden, Esq.
                                         Attorney for Plaintiff
                                         GUY HART

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF